**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| JULIE ANN W.,[1] | ) | Case No. 2:25-cv-08144-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER** |
| FRANK BISIGNANO, Commissioner of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

In accordance with the provisions of 28 U.S.C. § 636(c); Rule 73 of the Federal Rules of Civil Procedure; and Local Civil Rule 73.02(B)(1), the parties in this case have consented to have a United States Magistrate Judge conduct all proceedings. Based upon this consent, the case was referred to the undersigned for final disposition by Order of the Honorable Sherri A. Lydon, United States District Judge, on August 22, 2025. (*See* Dkt. No. 6.)

Plaintiff Julie Ann W. ("Plaintiff"), brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration regarding her claim for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). For the reasons set forth herein, the Court **ORDERS** that the Commissioner's decision should be **REVERSED**, and the case **REMANDED** for further consideration in accordance with this Order.

---

1 The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

## RELEVANT FACTS AND ADMINISTRATIVE PROCEEDINGS

Plaintiff was 51 years old on her alleged disability onset date, December 7, 2018.[2] (R. at 17, 73, 81.) Plaintiff initially claimed disability due to vision problems, diabetes mellitus, depression, low back pain, migraines, high blood pressure, and history of heart problems. (R. at 73, 81.) Plaintiff has a past relevant work as a billing clerk. (R. at 32.)

Plaintiff filed her application for DIB on September 7, 2021. (R. at 17.) Her application was denied initially and on reconsideration. (R. at 17, 72, 89.) After a hearing before an Administrative Law Judge ("ALJ") on May 3, 2024, the ALJ issued a decision on May 24, 2024, in which the ALJ found that Plaintiff was not disabled. (R. at 14–71.) The Appeals Council declined Plaintiff's request for review (R. at 1–6), making the ALJ's decision the Commissioner's final decision for purposes of judicial review.

In making the determination that the Plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.
>
> (2) The claimant has not engaged in substantial gainful activity since April 1, 2019, the amended alleged onset date (20 CFR 404.1571 et seq.).
>
> (3) The claimant has the following severe impairments: obstructive sleep apnea, chronic obstructive pulmonary disease, coronary artery disease, ST elevation myocardial infarction (STEMI) of inferoposterior wall, obesity, diabetes mellitus type II, degenerative lumbar stenosis, lumbar radiculopathy, lumbar spondylosis, bilateral sciatica (20 CFR 404.1520(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> (5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as

[2] Plaintiff subsequently amended her alleged disability onset date. (R. at 45.)

> defined in 20 CFR 404.1567(b) except the claimant can frequently balance and stoop, and occasionally climb, kneel, crouch, and crawl. The claimant can only occasionally be exposed to extreme heat, humidity, and pulmonary irritants such as fumes, dusts, noxious odors, gases, and poor ventilation, etc. The claimant cannot read small (10 point) print type instructions but can use computers or other machinery that permits the user to enlarge text easily. The claimant is limited to frequent far acuity.
>
> (6) The claimant is capable of performing past relevant work as a billing clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
>
> (7) The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2019, through the date of this decision (20 CFR 404.1520(f)).

(R. at 19–32.)

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in the Act as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, the Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's official Listing of Impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents her from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an

individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof with respect to the first four steps of the analysis. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017). Once the claimant has established an inability to return to her past relevant work, the burden shifts to the Commissioner to show that the claimant—considering her age, education, work experience, and residual functional capacity—can perform alternative jobs and that such jobs exist in the national economy. SSR 82-62, 1982 WL 31386, at *3; *Grant*, 699 F.2d at 191; *Pass*, 65 F.3d at 1203; *Monroe v. Colvin*, 826 F.3d 176, 180 (4th Cir. 2016).

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the Commissioner supported his findings with substantial evidence and applied the correct law. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015); *Woods v. Berryhill*, 888 F.3d 686, 691 (4th Cir. 2018); *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 94 (4th Cir. 2020); 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3). Consequently, the Act precludes a de novo review of the evidence and requires that the court uphold the Commissioner's decision as long as it is supported by substantial evidence. *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988); *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012); *Mascio*, 780 F.3d at 640; *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 383 (4th Cir. 2021); 42 U.S.C. § 405(g).

"Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Dowling*, 986 F.3d at 383 (citing *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015)). It is "more than a mere scintilla of evidence but may be less than a preponderance."

*Pearson*, 810 F.3d at 207 (citing *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012)). In reviewing for substantial evidence, the court does not undertake to "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *Hancock*, 667 F.3d at 472; *Arakas*, 983 F.3d at 95; *Dowling*, 986 F.3d at 383. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," the reviewing court must defer to the ALJ's decision. *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020) (citing *Hancock*, 667 F.3d at 472).

However, the court does not "reflexively rubber-stamp an ALJ's findings." *Dowling*, 986 F.3d at 383 (citing *Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017)). An ALJ may not cherry-pick, misstate, or mischaracterize material facts. *Arakas*, 983 F.3d at 99 (citing *Lewis*, 858 F.3d at 869). Rather, ALJs "must 'build an accurate and logical bridge' from the evidence to their conclusions." *Arakas*, 983 F.3d at 95 (quoting *Monroe*, 826 F.3d at 189).

## DISCUSSION

Plaintiff contends that the ALJ did not properly consider and account for her obstructive sleep apnea, diverticulosis, and visual limitations, and improperly discounted her subjective complaints. (*See generally* Dkt. No. 12.) Plaintiff further argues that the ALJ did not properly consider her past relevant work and erroneously relied on the vocational expert's testimony in finding that Plaintiff could perform such work. (*Id.*) For these reasons, Plaintiff contends that the decision must be reversed, and her case remanded for appropriate consideration of the relevant issues. In response, the Commissioner asserts that the ALJ's decision is supported by substantial evidence and free from legal error. (*See generally* Dkt. No. 13.) The Commissioner argues that the decision should therefore be affirmed. (*Id.*) For the reasons set forth in greater detail below, the undersigned agrees with Plaintiff and **REVERSES** the decision.

## I. ALJ Decision

In his seventeen-page decision, the ALJ considered whether Plaintiff had been disabled at any point from her alleged disability onset date through the date of the decision. (R. at 17–33.) In doing so, the ALJ first recounted the applicable legal standards and determined that Plaintiff had not engaged in substantial gainful activity since her amended alleged disability onset date. (R. at 17–19.) The ALJ then concluded that Plaintiff had severe impairments, including obstructive sleep apnea, chronic obstructive pulmonary disease, coronary artery disease, ST elevation myocardial infarction (STEMI) of inferoposterior wall, obesity, diabetes mellitus type II, degenerative lumbar stenosis, lumbar radiculopathy, lumbar spondylosis, and bilateral sciatica. (R. at 19–21.) With respect to Plaintiff's non-severe impairments, the ALJ determined:

> The undersigned finds the claimant's congenital dentofacial deformity (Exhibits 9F, 13F, 14F), history of heart artery stent (Exhibit 9F), gastroesophageal reflux disease (Exhibit 9F), hyperlipidemia (Exhibit 9F), depression (Exhibit 9F), anxiety (Exhibit 9F), hypertension (Exhibit 8F), bilateral cataracts (Exhibit 2F/11), nystagmus (Exhibit 2F), headache (Exhibit 5F/147), and choledocholithiasis (Exhibit 5F/163), are such slight abnormalities having such minimal effect both singly and in combination they would not be expected to interfere with her ability to work, irrespective of age, education, or work experience and are therefore "non-severe" (20 CFR 404.1522). . . .

(R. at 20.) The ALJ then evaluated Plaintiff's medically determinable mental impairments and the broad functional areas of Plaintiff's mental functioning. (R. at 20–21.)

Continuing on, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 21–24.) The ALJ then found that Plaintiff could perform light work with certain limitations. (R. at 24.) The ALJ supported this residual functional capacity ("RFC") determination with record evidence, including Plaintiff's hearing testimony and treatment records. (R. at 24–32.)

Relevant to Plaintiff's allegations of error, the ALJ considered, weighed, and accounted for Plaintiff's obstructive sleep apnea, diverticulosis, visual limitations, and subjective complaints as follows:

> The claimant testified she lives in a one-story single-family home. There are two steps going into the house. There are no accessibility modifications in the kitchen or bathroom. She lives with her husband. They have a cat and a dog. They both care for them. The dog is medium sized. Her husband walks the dog and takes both pets to the veterinarian.
>
> She is 5'3" tall and weighs 260 pounds. She is right-handed. She drove to the attorney's office. She drives a couple of times a week. She does not have a handicapped placard. She does not receive Worker's Compensation. She graduated from college with a degree in criminal justice.
>
> She last worked on April 11, 2019. Her earnings in 2019 are related to the switchover of the company to new owners. She was a part-owner in the company. The official sale date was December 7, 2018, and she continued to work until April 1, 2019, and was getting a salary during that time. She was a medical billing coordinator. She signed a one-year noncompete agreement.
>
> She was not capable of working for another company because she cannot see very well. Her work was accommodated while she was working for the family-owned business, with things like bigger screens. If she had to be out for medical or other reasons, she could because her family understood.
>
> She was born premature, and that is a large part of her vision problem according to her ophthalmologist. She could not see the computer screens and had to magnify the words. She has a ruler that was a magnifier to magnify the page. Her family was really accommodating. She still has vision problems today. She cannot go anywhere. She can read a book by taking off her glasses and bringing the book closer. She does read sometimes. She reads with her iPad and makes the text bigger. She can read a regular book, but she has to pick it up. Her near vision is better than her far vision. Her doctor has not pulled her driver's license. Glasses help. She drives, but she does not really travel far, no more than five miles. Her vision problem is just distance. She goes to the optometrist every couple of years. She got glasses with prisms. Her vision is 20/40 and 20/50 corrected.
>
> She also has lower back issues which make it hard to walk, so she does not walk often. She takes medication for diabetes. The medication makes her dizzy, hot, and nauseous. She is treated for migraines. She was having migraines back when she was working. She has about two to four migraines a month. She has hypertension and takes medication for it. She has obstructive sleep apnea and needs surgery to cure it. She has not had a sleep study in a while.

She has trouble standing and walking. Regarding sitting, it depends on the chair. It is difficult if it is a hard, un-cushioned chair. Her best purchase was a Lazy Boy. She sits in her recliner about half the day. She can sit for about thirty minutes without changing positions or standing up. She has carpal tunnel syndrome. Her grip is not great, but it is okay. When she was keyboarding, she would have to take breaks. She can stand for fifteen minutes and walk for fifteen minutes. When she unloads groceries, she takes breaks in between bringing bags. She has to walk through her back yard to bring groceries in. The heaviest thing she brings in is a gallon of tea. She has no problem bending over. When she does chores, she takes a break after each task. . . . Her house is 1200 square feet. On a bad day it will take a day or two to clean the house. She has a bad day once every six months. She does not do any yard work. She goes grocery shopping every Wednesday.

When she had surgery, she could not eat solid food and did not do a lot of cooking. She visits her mother and father once a week. She and her husband do not go out to eat. She does not go hunting or fishing.

She has always had back problems. She had two back procedures in 2021.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. . . .

Claimant was seen on August 20, 2021, at Lexington Medical Center. She presented with nausea, vomiting, and dehydration which improved with medication and intraven[ous] fluids. She was given prescriptions for Compazine and Zofran. Final diagnoses were nausea and vomiting, dehydration, and hyperglycemia due to diabetes mellitus. (Exhibit 3F/75.) . . . .

Columbia Eye Clinic records dated December 23, 2021, indicate her new glasses with prisms were "working great." Vision was 20/40 and 20/50. (Exhibit 2F/6-7). She stated she did not recall seeing a pediatric ophthalmologist, but her vision had never been very sharp with smaller print. Her vision was much sharper with glasses. (Exhibit 2F/11). . . .

Claimant was seen on December 22, 2022, at Lexington Family Practice to follow up for hypertension, diabetes, hyperlipidemia, anxiety, gastroesophageal reflux disease, and nausea. She was taking care of her father who has dementia and was having to take Xanax in addition to her antidepressant for that. She had been doing well with diet and exercise. She was medication compliant. (Exhibit 7F/34). She had a normal mood and affect. She was oriented to person, place, and time. She was alert. Her body mass index was 34.39. Diagnoses were anxiety, coronary artery disease involving native coronary artery of native heart without angina pectoris,

idiopathic hypertension, diabetes mellitus, gastroesophageal reflux disease, essential hypertension, and nausea. (Exhibit 7F/35-36).

She was seen in follow up at Lexington Medical Heart & Vascular Center – Cardiology on March 17, 2023. She reported she had adjusted her diet and was not working out quite as much as she was previously. She had not had any chest pain, pressure, or tightness. She did report fatigue. She was using a CPAP machine. She had not had her thyroid or CBC recently and was going to [see] her primary care physician for that. She had not had any syncope, near syncope, palpitations, PND, orthopnea, or lower extremity edema. (Exhibit 7F/29).

Claimant was on Ozempic on April 23, 2023. (Exhibit 7F/27). She was experiencing nausea and vomiting. It was noted:

> [55]-year-old female with recurrent episodes of nausea and vomiting currently out of her antiemetics due to use this week. In her normal state of health until Tuesday night. She then developed nausea and vomiting with some bilious green fluid. No hematemesis. She had no diarrhea. She has been dry heaving a lot since has been able to keep nothing down she has been hot and cold and has had some abdominal discomfort from all the vomiting. She has not taken the Ozempic for weeks however is on SGLT2. She was found to be in starvation ketosis versus DKA with elevated ketones and boh. She was started on aggressive hydration and insulin drip on which her ketosis has settled down. Her vomiting has spontaneously resolved. Urine analysis was negative CT scan of the abdomen and pelvis with IV contrast showed scattered diverticulosis no evidence of any inflammation. She is stable and may go home today, on her home medications for diabetes. (Exhibit 7F/27).

ECG performed on May 3, 2023, showed a normal sinus rhythm. Most recent echocardiogram indicated her estimated ejection fraction was approximately 60%. She had grade I left ventricular diastolic dysfunction. There was aortic valve sclerosis without stenosis. There was mild mitral and trace tricuspid regurgitation. (Exhibit 9F/49). . . .

Her body mass index was down to 33.47. Review of symptoms was negative for arthralgias and myalgias, dizziness, headaches, light-headedness, or syncope. (Exhibit 8F/10).

Medical University of South Carolina records dated December 4, 2023, show she was seen for evaluation and treatment of a congenital dentofacial deformity and obstructive sleep apnea. She had been diagnosed with obstructive sleep apnea [] thirty years ago. She reported she was told she had severe obstructive sleep apnea. A sleep study performed on May 1, 2023, had shown an AHI of 64.6, and a supine AHI of 71.6. Daytime symptoms were sleepiness, morning headaches, dry mouth,

and fatigue. She also had a congenital malocclusion that caused TMJ that was worse in the morning and occasionally while eating. She was intolerant to CPAP therapy. (Exhibit 9F/7, 12). Past medical history mentions hypertension, hypercholesterolemia, type II diabetes mellitus, and myocardial infarction status-post stent placement. (Exhibit 9F/8). Physical examination revealed a mild left nasal valve collapse. Anterior rhinoscopy showed a bilateral deviated septum, no septal spur, and bilateral inferior turbinate hypertrophy. (Exhibit 9F/10).

She was seen in the LMC emergency department on December 25, 2023, for nausea, vomiting, and abdominal pain for one week. She had been taking nausea medication but stated it was not helping. (Exhibit 11F/6). Final diagnoses was emesis. Symptoms improved after medications, and she requested discharge. (Exhibit 11F/10).

Claimant underwent maxillomandibular advancement surgery (MMA) for her obstructive sleep apnea on February 14, 2024. On follow up on February 26, 2024, she reported intractable nausea and vomiting that had started that morning. She was feeling significantly unwell and could not keep anything down. She reported that similar episodes were reportedly diverticulitis. (Exhibit 13F/18). Her body mass index was 29.26 on February 27, 2024. (Exhibit 13F/27). On March 7, 2024, she was doing well. She was three weeks post-op. She was happy with nasal breathing and sleep. She denied any changes in bite, and the rubber bands were in place. Exhibit 14F/51, 58. She underwent a Botox injection to the bilateral masseter muscle that day. (Exhibit 14F/57). When she was seen on March 14, 2024, she reported some continuing symptoms with speech, with her tongue not fitting in her mouth properly. She was having TMJ problems with chewing harder items like meat. (Exhibit 14F/68). These problems did not appear to be present pre-surgery.

A second procedure was performed on April 27, 2024, to remove the hardware. Her lowest oxygen desaturation was 92%. Exhibit 14F/137. . . .

In sum, the above residual functional capacity assessment is supported by the physical examination findings, the medical imaging, and to some extent the prior administrative medical findings of the state agency consultants. In addition, the claimant's residual functional capacity assessment reconciles the foregoing with those statements made by the claimant concerning the limiting effects of her symptoms to the extent they are consistent with the objective and clinical evidence of record. The claimant's back pain improved in 2022 after her two radiofrequency ablation procedures. She made great progress in cardiac rehabilitation and could exercise for 45-50 minutes and walk for six minutes. She has lost significant weight since starting Ozempic, and her most recent body mass index is 29.26. More recent records show corrective surgery for her jaw deformity. She did have some ongoing issues after the surgery, but her doctors are working with her on the issues. Her residuals from her jaw surgery do not meet the twelve-month durational requirement.

(R. at 24–32.)

After justifying the RFC determination, the ALJ determined that Plaintiff was capable of performing her past relevant work as a billing clerk. (R. at 32.) Because Plaintiff was capable of performing past relevant work, the ALJ concluded that Plaintiff was not disabled at any point from the amended alleged onset date through the date of the decision. (R. at 32.)

## II. Analysis

### A. ALJ's Consideration of Plaintiff's Diverticulosis

As noted, Plaintiff contends that the ALJ erred in failing to properly consider her diverticulosis. (Dkt. No. 12 at 10–12.) Although it is not entirely clear, Plaintiff appears to contend that the ALJ erred in failing to consider Plaintiff's diverticulosis at Step Two, and in formulating her RFC. (*See generally id*.) As such, the undersigned has considered both potential errors.

With respect to the ALJ's consideration of Plaintiff's diverticulosis at Step Two, the undersigned agrees that the ALJ failed to properly address the limitations imposed by this impairment. (R. at 20–21.) At Step Two of the sequential evaluation process, the ALJ must determine whether Plaintiff has a severe impairment. 20 C.F.R. § 404.1520. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "Basic work activities" are "the abilities and aptitudes necessary to do most jobs," examples of which include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." *Id.* § 404.1522(b). In short, the "inquiry is a *de minimis* screening device to dispose of groundless claims." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).

As shown above, the ALJ's Step Two determination did not mention Plaintiff's diverticulosis at all. (*See supra* at 6; *see also* R. at 19–21.) The record, however, indicates that

Plaintiff was seen and treated for issues related to her diverticulosis on various occasions throughout the relevant period. (*See, e.g.*, R. at 280, 315, 554, 645, 1476, 1486, 1550–63, 2167–68, 2194.) For example, a CT scan performed on Plaintiff in 2019 revealed colonic diverticulosis. (R. at 554.) In November of 2020, Plaintiff appeared at Lexington Medical Center reporting that she had been vomiting and had not had a bowel movement for several days. (R. at 315.) A CT scan of Plaintiff's abdomen and pelvis at that time revealed scattered diverticulitis. (R. at 318.) Plaintiff reported to Lexington Medical Center again in April of 2023 with abdominal pain, nausea and vomiting. (R. at 1550.) A CT scan of Plaintiff's abdomen and pelvis performed in connection with this visit revealed scattered diverticulitis, as well. (R. 1550–56.) Plaintiff was seen again in December of 2023 for issues related to her diverticulosis, and a CT scan of her abdomen and pelvis taken on December 23, 2023 revealed "[a]cute focal thickening of the sigmoid color with findings compatible with diverticulitis." (R. at 2167–68.) In February 2024, Plaintiff again presented with vomiting related to her diverticulitis and was referred "to GI . . . for further evaluation and workup of her ongoing abdominal issues." (R. at 2194–97.)

First, these records are inconsistent with the ALJ's conclusion that Plaintiff's diverticulosis did not constitute a medically determinable impairment—whether severe or non-severe. What is more, the ALJ's failure to reference these records, or to otherwise mention Plaintiff's history of diverticulosis, frustrates the undersigned's ability to discern whether the ALJ even considered Plaintiff's diverticulosis when determining her severe and non-severe impairments at Step Two. *See Mascio*, 780 F.3d at 636–37 (noting remand may be appropriate when courts are left to guess at how the ALJ arrived at their conclusions and meaningful review is frustrated).

Nonetheless, the ALJ's Step Two error could be rendered harmless if "the ALJ consider[ed] all impairments, whether severe or not, at later steps." *Robinson v. Colvin*, No. 4:13-

cv-823-DCN, 2014 WL 4954709, at *14 (D.S.C. Sept. 29, 2014) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)); *see also Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (holding that there is "no reversible error where the ALJ does not find an impairment severe at [S]tep [T]wo provided that he or she considers that impairment in subsequent steps").

The ALJ is responsible for determining the RFC and must consider *all* of the relevant medical and other evidence in the record when doing so. *See* 20 C.F.R. §§ 404.1545, 404.1546. Pursuant to Social Security Ruling 96-8p,

> [i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual still may be able to do.

SSR 96-8p, 1996 WL 362207, at *5.

Thus, even assuming that the ALJ had appropriately considered Plaintiff's diverticulosis at Step Two and concluded that Plaintiff's diverticulosis was not a severe impairment, the ALJ still could have supported his decision with substantial evidence so long as he considered any limitations imposed by Plaintiff's diverticulosis in formulating Plaintiff's RFC. However, the ALJ's RFC discussion does not reflect that he did so here. (R. at 24–32.)

Indeed, the ALJ's RFC discussion makes only two passing references to Plaintiff's diverticulosis when summarizing the medical and other evidence in the record and engages in no further discussion of this diagnosed impairment. (R. at 24–32.) Rather, the records relevant to Plaintiff's diverticulosis—which undermine the ALJ's purported conclusion that Plaintiff's diverticulosis did not constitute a medically determinable impairment at all—"were either glossed

over by the ALJ or otherwise not mentioned in the ALJ's decision," rendering such decision unsupported by substantial evidence. *Rosa L. v. O'Malley*, No. 6:23-cv-2312-JDA-KFM, 2024 WL 1623713, at *5 (D.S.C. Mar. 18, 2024) (recommending that the Court reverse the Commissioner's decision and remand the case where ALJ failed to address Plaintiff's documented irritable bowel syndrome at Step Two of the sequential evaluation process and made no mention of it in explaining RFC limitations), *adopted sub nom. Ledbetter v. Comm'r of Soc. Sec. Admin.*, 2024 WL 1620306 (D.S.C. Apr. 15, 2024). Though the ALJ may have determined that additional limitations pertaining to Plaintiff's diverticulosis were not necessary based on the record evidence, it remains the ALJ's duty to make that determination and provide a sufficient explanation for it. *See Dowling*, 986 F.3d at 387 (noting that every conclusion reached by an ALJ when evaluating a claimant's RFC must be accompanied by "a narrative discussion describing [] the evidence" that supports it). Where, as here, the ALJ fails to discuss the impact of a documented and diagnosed impairment, remand is warranted. *See, e.g.*, *Anthony M. v. Comm'r, Soc. Sec. Admin.*, No. CV SAG-19-651, 2020 WL 434581, at *3 (D. Md. Jan. 28, 2020) (remanding because "the ALJ was required to consider the combined effect of Plaintiff's severe and nonsevere impairments in his RFC discussion . . . .").

**B. Remaining Allegations of Error**

Plaintiff also argues the ALJ erred in: (1) failing to properly consider and account for her obstructive sleep apnea and visual limitations; (2) improperly discounting her subjective complaints; and (3) failing to properly consider her past relevant work. (*See generally* Dkt. No. 12.) The undersigned declines to address these remaining allegations of error, as they may be rendered moot on remand. *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 763–64 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing

is conducted *de novo*). As part of the overall reconsideration of the claim upon remand, the ALJ should, if necessary, also take into consideration Plaintiff's remaining allegations of error.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **REVERSED**, and Plaintiff's case is **REMANDED** for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

September 23, 2026
Charleston, South Carolina